OFFICE OF THE ATTORNEY GENERAL · STATE OF TEXAS

August 11, 1999

The Honorable Bill Hill
Dallas County District Attorney
Civil Section
Administration Building
411 Elm Street
Dallas, Texas 75202

Opinion No. JC-0092

Re: Whether chapter 312 of the Tax Code precludes a commissioners court from providing an economic development grant to a private company under section 381.004 of the Local Government Code pursuant to which the county makes payments to the company that are the economic equivalent of an abatement of real property taxes (RQ-1068)

Dear Mr. Hill:

On behalf of the Dallas County Commissioners Court, your predecessor in office asked whether chapter 312 of the Tax Code, the Property Redevelopment and Tax Abatement Act, precludes a commissioners court from providing an economic development grant to a private company pursuant to which the county would make payments to the company that are the economic equivalent of an abatement of real property taxes. The agreement prompting the request states that section 381.004 of the Local Government Code authorizes the commissioners court to provide the grant. While we conclude that chapter 312 neither authorizes nor precludes the county from making payments of this kind, we also conclude that section 381.004 of the Local Government Code does not authorize a commissioners court to make grants.

We begin with a brief description of the relevant background. Your predecessor asked whether chapter 312 of the Tax Code precludes the Dallas County Commissioners Court "from providing an economic development grant to a business under Section 381.004 of the Local Government Code, when the amount of the grant is to be determined by a specified percentage of the additional real property tax revenues received by Dallas County from the business as a result of the business' development of its property." Letter from John B. Dahill, Assistant District Attorney, Dallas County, to Honorable Dan Morales, Attorney General 2 (Dec. 29, 1997) (on file with Opinion Committee) [hereinafter Request Letter]. He explained that the county was not authorized to offer the benefit as a tax abatement under the terms of chapter 312.

In response to a request from this office for additional briefing regarding the legal basis for the agreement, your office submitted a copy of an economic development agreement between Dallas County and a private company that owns real property in the county entitled "Economic

Development Program Agreement" ("the Dallas County EDP Agreement" or "the agreement"). Pursuant to the agreement, the county has promised to make yearly payments to the company for a ten-year period. Each yearly payment is equal to fifty percent of the amount of property tax collected in that year by the county from the private company on the value of the real property above its 1996 value. The county's obligation to make these yearly payments is subject to (i) the private company's economic performance, as measured by a set increase in the total property value and either the company's total number of employees or annual payroll in Dallas County, and (ii) an Attorney General opinion stating that the county is not precluded from making the payments by chapter 312 of the Tax Code. The agreement states that it is authorized by section 381.004 of the Local Government Code, which permits counties to establish economic development programs. *See* Letter from John B. Dahill, Assistant District Attorney, Dallas County, to Elizabeth Robinson, Chair, Opinion Committee, Office of the Attorney General (Apr. 16, 1999) (on file with Opinion Committee) [hereinafter Supplemental Brief].

This office does not generally review specific contracts or interpret contractual terms. *See, e.g.,* Tex. Att'y Gen. Op. Nos. JC-0032 (1999) at 4 (contract interpretation beyond purview of this office); DM-383 (1996) at 2 (interpretation of contract not appropriate function for opinion process); DM-192 (1992) at 10 ("This office, in the exercise of its authority to issue legal opinions, does not construe contracts."); JM-697 (1987) at 6 ("review of contracts is not an appropriate function for the opinion process"). For this reason, in responding to this opinion request, we discuss the Dallas County EDP Agreement only by way of example.

## I. Whether Chapter 312 of the Tax Code Precludes Payments of this Kind

First, we address whether payments of this kind are precluded by chapter 312 of the Tax Code. Your predecessor explained that the property subject to the Dallas County EDP Agreement is also subject to a pre-existing municipal tax abatement agreement and that the county is therefore limited to entering into a tax abatement agreement with the same terms. Because "[t]he city within which the property is located . . . has elected to provide tax abatement at a different percentage . . . . Dallas County is prohibited by Tax Code Section 312.206(a) from entering into an abatement agreement at the same percentage as it wishes to use in the grant formula." Request Letter, at 2. Noting that the payments would have the "same economic impact" as a ten year tax abatement under chapter 312 of the Tax Code, your predecessor asked whether the payments would be precluded by chapter 312.

The legislature enacted the statutory predecessor to chapter 312, former article 1066f of the Revised Civil Statutes,[1] to implement article VIII, section 1-g, a 1981 amendment to the Texas Constitution. *See* Act of Aug. 10, 1981, 67th Leg., 1st C.S., ch. 5, § 9, 1981 Tex. Gen. Laws 53, 57 (former article 1066f, Property Redevelopment and Tax Abatement Act, to take effect upon adoption

---

[1]Former article 1066f was repealed and codified in chapter 312 of the Tax Code in 1987. *See* Act of May 1, 1987, 70th Leg., ch. 191, §§ 1 (adopting title 3 of Tax Code), 12 (repealing former article 1066f), 1987 Tex. Gen. Laws 1410, 1421-25, 1466.

of Tex. Const. art. VIII, § 1-g); *see also* Tex. Att'y Gen. LO-89-31, at 3 (noting that Tax Increment Financing Act of 1981 and Property Redevelopment and Tax Abatement Act enacted in anticipation of adoption of Tex. Const. art. VIII, § 1-g). Article VIII, section 1-g specifically permits "[t]he legislature by general law [to] authorize cities, towns, and other taxing units to grant exemptions or other relief from ad valorem taxes on property located in a reinvestment zone for the purpose of encouraging development or redevelopment and improvement of the property." TEX. CONST. art. VIII, § 1-g. As originally enacted, former article 1066f authorized cities to abate taxes; counties were, for all practical purposes, required to participate in municipal tax abatement agreements and were not authorized to enter into separate agreements with respect to property not subject to a municipal agreement.[2] Counties were not authorized to enter into their own tax abatement agreements until 1985, when the legislature enacted amendments to former article 1066f now codified as subchapter C of chapter 312.[3]

Subchapter C of chapter 312 authorizes a county commissioners court to designate an area of the county "that does not include area in the taxing jurisdiction of a municipality" as a reinvestment zone. *See* TEX. TAX CODE ANN. § 312.401(a) (Vernon 1992). Before designating an area as a reinvestment zone, the county must hold a public hearing on the designation and find that the designation "would contribute to the retention or expansion of primary employment or would attract major investment in the zone that would be a benefit to the property to be included in the zone and would contribute to the economic development of the county." *Id.* § 312.401(b). The commissioners court must provide public notice of the hearing. *Id.* Once it has designated a reinvestment zone, the commissioners court may execute a tax abatement agreement with an owner of taxable real property located in the zone. *Id.* § 312.402(a) (Vernon Supp. 1999). Pursuant to a tax abatement agreement, a county, like a city, may agree "to exempt from taxation a portion of the value of the real property . . . for a period not to exceed 10 years . . . on the condition that the owner of the property make specific improvements or repairs to the property." *Id.* § 312.204(a) (Vernon 1992). Significantly, however, the tax-abatement authority of a county with respect to property located in the taxing jurisdiction of a city is more circumscribed. Under section 312.206(a) of the Tax Code, if a municipality has entered into a tax abatement agreement with a property owner, a county may abate taxes on the property only pursuant to an agreement containing terms identical to the municipal tax abatement agreement. *See id.* § 312.206(a) (Vernon Supp. 1999). Although the legislature recently amended section 312.206(a) to remove this limitation, that amendment does not apply to tax abatement agreements entered into prior to its effective date, September 1, 1999.[4]

Although Dallas County's authority to enter into a tax abatement agreement regarding the property at issue was limited by an existing municipal tax abatement, we conclude that the payments of the kind provided in the Dallas County EDP Agreement were not precluded by chapter 312.

---

[2]*See* Act of Aug. 10, 1981, 67th Leg., 1st C.S., ch. 5, § 2, 1981 Tex. Gen. Laws 53, 53-54.

[3]*See* Act of May 10, 1985, 69th Leg., R.S., ch. 104, § 3, 1985 Tex. Gen. Laws 548, 549.

[4]*See* Tex. H.B. 3034, 76th Leg., R.S. (1999).

Chapter 312 prevented a county from entering into a tax abatement agreement with respect to property subject to a municipal tax abatement agreement containing terms different from those in the municipal agreement. But the payments at issue here are not tax abatements. The owner of property subject to a chapter 312 tax abatement agreement is entitled to exemption from taxation by a taxing unit "of all or part of the value of the property as provided by the agreement." TEX. TAX CODE ANN. § 11.28 (Vernon 1992). Thus, an owner who is party to a tax abatement agreement does not pay the taxes that are abated pursuant to the agreement. Pursuant to an agreement like the Dallas County EDP Agreement, however, the private company is not entitled to any tax exemption and will pay county property taxes on the entire value of its property. Rather, the private company is entitled to ten yearly grant payments "determined by a specified percentage of the additional real property tax revenues received by Dallas County from the business as a result of the business' development of its property." Request Letter, at 2. Chapter 312 simply does not speak to this kind of arrangement. While chapter 312 does not authorize this kind of arrangement, neither does chapter 312 preclude it.

## II. Whether a County is Authorized to Make Payments of this Kind

The conclusion that chapter 312 neither precludes nor authorizes this kind of arrangement does not end our analysis. Courts of this state have long held "that although a commissioners court may exercise broad discretion in conducting county business, the legal basis for any action taken must be grounded ultimately in the constitution or statutes." *Guynes v. Galveston County*, 861 S.W.2d 861, 863 (Tex. 1993) (citing *Canales v. Laughlin*, 214 S.W.2d 451, 453 (Tex. 1948)). Specifically with respect to contracts, courts have held that the authority of a commissioners court to make contracts on behalf of the county is limited to that conferred either expressly or by necessary implication by the constitution and laws of the state. *See, e.g., Childress County v. State*, 92 S.W.2d 1011, 1016 (Tex. 1936); *Jack v. State*, 694 S.W.2d 391, 397 (Tex. App.–San Antonio 1985, writ ref'd n.r.e.). Thus, the conclusion that payments of this kind are not precluded by chapter 312 does not establish that a commissioners court is authorized to make them. Such payments are authorized only if the commissioners court has authority to enter into this type of agreement. That authority must be express or necessarily implied by statute.

### A. Section 381.004 of the Local Government Code

Both the request letter and the supplemental brief assert that section 381.004 of the Local Government Code authorizes a commissioners court to make economic development grants and therefore permits agreements of this kind. Section 381.004 provides in pertinent part as follows:

> (b) *To stimulate business and commercial activity in a county, the commissioners court of the county may develop and administer a program:*
>
> (1) *for state or local economic development;*

(2) for small or disadvantaged business development;

(3) *to stimulate, encourage, and develop business location and commercial activity in the county*; or

(4) to improve the extent to which women and minority businesses are awarded county contracts.

(c) The commissioners court may:

(1) *contract with another entity for the administration of the program*;

(2) authorize the program to be administered on the basis of county commissioner precincts;

(3) *use county employees or funds for the program*; and

(4) accept contributions, gifts, or other resources to develop and administer the program.

TEX. LOC. GOV'T CODE ANN. § 381.004(b), (c) (Vernon 1999) (emphasis added). In section 381.004, the term "another entity" is defined to include "the federal government, the State of Texas, a municipality, school or other special district, finance corporation, institution of higher education, charitable or nonprofit organization, foundation, board, council, commission, or any other person." *Id.* § 381.004(a)(1).

Again, a commissioners court's authority to make a contract must be express or necessarily implied by statute. *Childress County*, 92 S.W.2d 1011; *Jack*, 694 S.W.2d 391. As we discuss at some length below, the legislature generally provides express authority for economic development grants. *See* statutes discussed *infra* pp. 8-10. Section 381.004, by contrast, does not provide this authority expressly. Subsection (b) of section 381.004 expressly authorizes a commissioners court in general terms to develop a program for "state or local economic development" and "to stimulate, encourage, and develop business location and commercial activity in the county." TEX. LOC. GOV'T CODE ANN. § 381.004(b)(1), (3) (Vernon 1999). Subsection (c) specifically authorizes a commissioners court to contract with another entity "for the administration of the program," *id.* § 381.004(c)(1), and to use "county employees or funds for the program," *id.* § 381.004(c)(3). This office has concluded that the express language authorizing a commissioners court to contract for the administration of a program indicates that the commissioners court lacks authority under section 381.004 to enter into other kinds of contracts. *See* Tex. Att'y Gen. LO-98-007 (construing section 381.004 to preclude commissioners court from providing funds to small business development center because statute "does not authorize a commissioners court to appropriate funds to a program that was not developed by the county and is not administered either by the county or by another entity under

contract with the county"). None of these provisions expressly authorizes a commissioners court to enter into agreements such as the Dallas County EDP Agreement whereby the county agrees to make payments of county funds to a private company on the condition that the company increase the value of its property and employ a certain number of employees or maintain a certain annual payroll in the county. And, again, no express provision in section 381.004 gives a commissioners court the more general authority to make economic development grants.

Nor do we believe that the authority to enter into an agreement like the Dallas County EDP Agreement, or the more general authority to make economic development grants, may be implied from section 381.004. A commissioners court may carry out programs to foster economic development in any number of ways. Because the authority to enter into agreements of this kind, or to make economic development grants, is generally expressly provided by the legislature, *see* TEX. TAX CODE ANN. ch. 312 (Vernon 1992 & Supp. 1999) and statutes discussed *infra* pp. 8-10, and is not necessary to foster economic development, we conclude that this authority cannot be implied from the authority to adopt programs to foster economic development.

Furthermore, when the legislature has authorized an entity to make incentive payments based on improvements to real property, it has included procedural requirements designed to protect the tax-paying public. Although the payments contemplated by the agreement are not tax abatements, they are, as your predecessor noted, identical in economic effect. *See* Request Letter, at 1 ("The economic consequence of the grant to both the company and the county is the same as would occur if the county granted [a] tax abatement to the company for the same duration as the grant and at the same percentage as is used in the grant formula."). Chapter 312 of the Tax Code authorizes a commissioners court to offer tax abatements only after it has provided public notice, held a public hearing, and formally designated a reinvestment zone according to statutory criteria, *see* TEX. TAX CODE ANN. § 312.402 (Vernon 1992 & Supp. 1999), and only pursuant to an agreement containing statutorily prescribed terms and conditions, *see id.* §§ 312.204, .205. To construe section 381.004 to authorize a commissioners court to offer economic incentives akin to those that the legislature has expressly authorized in chapter 312 would undermine these procedural protections. *See* TEX. GOV'T CODE ANN. § 311.023(4), (5) (Vernon 1998) (providing that in construing statutes court may consider both laws on similar subjects and consequences of particular construction) (Code Construction Act).

**B.  Section 381.004 and Article III, Section 52-a of the Texas Constitution**

The request letter urges this office to broadly construe section 381.004 because it "appears to be enabling legislation" for article III, section 52-a of the Texas Constitution. *See* Request Letter, at 3. That 1987 constitutional amendment provides that "[n]otwithstanding any other provision of this constitution, the legislature may provide for the creation of programs and the making of loans and grants of public money . . . for the public purposes of development and diversification of the

economy of this state. . . ." TEX. CONST. art. III, § 52-a.[5] In support of the contention that section 381.004 implements article III, section 52-a, the brief notes that the statute was adopted by the same legislature that adopted section 380.001 of the Local Government Code, enabling legislation for article III, section 52-a that expressly authorizes cities to make economic development loans and grants. *See* discussion of TEX. LOC. GOV'T CODE ANN. § 380.001 (Vernon 1999) and Tex. Att'y Gen. Op. No. DM-185 *infra* p. 13. Dallas County's submissions to this office suggest that section 381.004 should be construed to authorize a county to undertake any economic development activity contemplated by article III, section 52-a. The supplemental brief, for example, asserts that section 381.004 "parallels Article III, Section 52-a . . . by using the word 'program,' which seems to give broad discretion to the county to determine the types of measures it may establish." Supplemental Brief, at 2. That brief also suggests that because the term "program" derives from the constitution, "the county's decision that its proposal is a program to promote economic development is to be given great weight." *Id.* at 3.

In the past, this office has specifically reserved the question of whether section 381.004 implements article III, section 52-a. *See* Tex. Att'y Gen. LO-98-007, at 3 n.1; LO-96-035, at 3 n.2. Because the legislature enacted section 381.004 in 1989, just two years after it proposed article III, section 52-a,[6] and in the same session it enacted article III, section 52-a enabling legislation for cities, it seemed likely that the legislature enacted section 381.004 as article III, section 52-a enabling legislation for counties. Given Dallas County's reliance on article III, section 52-a for its construction of section 381.004, we now examine the relationship of section 381.004 to article III, section 52-a in some detail. After reviewing the purpose of article III, section 52-a, statutes enacted to implement it, and the legislative history of section 381.004, we conclude that section 381.004 is not article III, section 52-a enabling legislation and, moreover, that the legislature did not intend section 381.004 to authorize counties to make economic development grants.

## 1. **Article III, Section 52-a**

We begin with some background about article III, section 52-a, which provides in pertinent part:

> Notwithstanding any other provision of this constitution, the legislature may provide *for the creation of programs* and *the making of loans and grants of public money*, other than money otherwise dedicated by this constitution to use for a different purpose, for the public purposes of development and diversification of the economy of the state, the elimination of unemployment or underemployment in the state, the stimulation of agricultural innovation, the fostering

---

[5]*Proposed by* Act of May 20, 1987, 70th Leg., R.S., H.J.R. 5, § 1, 1987 Tex. Gen. Laws 4122, 4123, *adopted at* Nov. 3, 1987 election.

[6]*Id.*

> of the growth of enterprises based on agriculture, or the development
> or expansion of transportation or commerce in the state.

TEX. CONST. art. III, § 52-a (emphasis added). Prior to the adoption of this 1987 constitutional provision,[7] sections 51 and 52 of article III, which prohibit the legislature or a political subdivision from granting public money or lending public credit to a private entity, had been interpreted by the courts and this office to require that public money must be expended for the direct accomplishment of a public purpose. *See generally* Tex. Att'y Gen. Op. Nos. JM-1227 (1990) at 2; JM-1255 (1990) at 2-3. Article III, section 52-a "was intended by the legislature, and by the voters who adopted it, to create exceptions to the pre-existing constitutional prohibitions on the lending of public credit." Tex. Att'y Gen. Op. No. JM-1227 (1990) at 3. It did this by providing that programs fostering economic growth or loans or grants of public funds to assist private businesses to foster economic growth serve a public purpose. *See* Tex. Att'y Gen. Op. No. JM-1255 (1990) at 8-9 (article III, section 52-a does not dispense of requirement that public funds must be used to achieve a public purpose but rather "adds to the purposes for which the legislature may authorize the loan or grant of public funds").

Article III, section 52-a is not self-enacting; rather it permits the legislature to enact legislation providing for economic development. *See* Tex. Att'y Gen. Op. No. JM-1227 (1990) at 3. It authorizes the legislature to provide for economic development in two different ways—by providing for the creation of programs *and* the making of loans and grants of public money. Section 381.004, which makes no mention of loans or grants, stands in stark contrast to a number of provisions enacted pursuant to article III, section 52-a that expressly authorize the use of public money for economic development grants and loans. Furthermore, in contrast to section 381.004, it is clear from references in their statutory language or their legislative history that these provisions were enacted to implement article III, section 52-a.

## 2. Statutes Enacted to Implement Article III, Section 52-a

Several statutes enacted to implement article III, section 52-a relate to economic development undertaken by municipalities. For example, in section 380.001 of the Local Government Code, which was enacted to implement section 52-a, *see* Tex. Att'y Gen. Op. No. DM-185 (1992) at 4 (noting that author of section 380.001 testified that bill was enabling legislation for article III, § 52-a); HOUSE COMM. ON URBAN AFFAIRS, BILL ANALYSIS, Tex. H.B. 3192, 71st Leg., R.S. (1989) (bill analysis for legislation enacting section 380.001 indicating that bill was enabling legislation for article III, § 52-a), the legislature has expressly authorized the governing body of a municipality to "establish and provide for the administration of one or more programs, including programs for *making loans and grants of public money* and providing personnel and services of the municipality, to promote state or local economic development and to stimulate business and commercial activity in the municipality." TEX. LOC. GOV'T CODE ANN. § 380.001(a) (Vernon 1999) (emphasis added).

---

[7]*See id.*

Similarly, the legislature expressly created municipal management districts to accomplish the purposes of article III, section 52-a. *See* TEX. LOC. GOV'T CODE ANN. §§ 375.001 (Vernon 1999) (legislative statement that municipal management district is essential to accomplishment of purposes of Tex. Const. art. III, § 52-a); 376.001, .002, .006 (Houston Downtown Management District created to accomplish purposes of Tex. Const. art. III, § 52-a); 376.041, .042, .046 (Westchase Area Management District created to accomplish purposes of Tex. Const. art. III, § 52-a); 376.081, .086 (Greater Greenspoint Management District created to accomplish purposes of Tex. Const. art. III, § 52-a); 376.111, .116 (First Colony Management District created to accomplish purposes of Tex. Const. art. III, § 52-a); 376.121, .122, .126 (Upper Kirby Management District created to accomplish purposes of Tex. Const. art. III, § 52-a); 376.211, .212, .216 (Harris County Improvement District No. 2 created to accomplish purposes of Tex. Const. art. III, § 52-a). These districts have the express authority to make loans and grants to a public or private corporation or any other person. *See id.* §§ 376.026 (Houston Downtown Management District authority to make grants and loans); 376.064 (Westchase Area Management District authority to make grants and loans); 376.100 (Greater Greenspoint Management District authority to make grants and loans); 376.135 (First Colony Management District authority to make grants and loans); 376.235 (Harris County Improvement District No. 2 authority to make grants and loans).

In implementing article III, section 52-a, the legislature has also authorized other entities to make loans and grants for economic development. Certain river authorities, for example, may sponsor economic development programs pursuant to section 3 of article 717p of the Revised Civil Statutes. *See* TEX. REV. CIV. STAT. ANN. art. 717p, § 3 (Vernon Supp. 1999). The legislature has expressly found that programs authorized by this provision are a specific public purpose of a river authority in accordance with article III, section 52-a.[8] Article 717p expressly provides that "[a] program under this section may involve grants or loans of money, services, or property to a person engaged in an economic development activity." *Id.* § 3(d).[9]

Additionally, the legislature has authorized state entities to make loans and grants pursuant to provisions implementing article III, section 52-a. Chapter 44 of the Agriculture Code, for example, authorizes the Texas Agricultural Finance Authority board of directors to create an agricultural diversification program. The legislature specifically provided that the statutory predecessor to chapter 44 creating the agricultural diversification program would take effect only upon the voters' approval of article III, section 52-a.[10] The board is expressly authorized to make

---

[8]*See* Act of May 19, 1995, 74th Leg., R.S., ch. 326, § 2, 1995 Tex. Gen. Law 2828, 2830.

[9]For other examples of statutes pertaining to political subdivisions and districts, *see* TEX. LOC. GOV'T CODE ANN. § 383.021 (Vernon 1999) (authorizing creation of county management districts in counties with population under 400,000); TEX. GOV'T CODE ANN. §§ 2301.001(6), .007 (Vernon 1999) (authorizing a county, municipality, certain districts and authorities "to make loans and grants of public money or property [for projects relating to the development of the super collider facility] that contribute to the public purposes of development and diversification of the economy of the state, the elimination of underemployment and unemployment in the state, or the development or expansion of transportation or commerce in the state"); 2301.068 (making express reference to article III, section 52-a).

[10]*See* Act of July 20, 1987, 70th Leg., 2d C.S., ch. 32, art. 1, § 2, 1987 Tex. Gen. Laws 108, 112.

loans and grants under the agricultural diversification program. *See* TEX. AGRIC. CODE ANN. § 44.012 (Vernon Supp. 1999). And subchapter D of the Transportation Code, another provision enacted pursuant to article III, section 52-a, authorizes the Texas Department of Transportation to loan money to a corporation that provides passenger rail service in the state. *See* TEX. TRANSP. CODE ANN. § 456.062(a) (Vernon 1999) ("Under the authority of Section 52-a, Article III, Texas Constitution, and from funds appropriated from the general revenue fund for this purpose, the commission may loan money to an eligible corporation that provides rail passenger service in the state.").

In light of these article III, section 52-a enabling statutes, all of which expressly authorize entities to make economic development loans or grants with public funds, the omission of any reference to loans or grants in section 381.004 of the Local Government Code is striking. We note in particular that section 380.001 of the Local Government Code expressly authorizing municipal economic development loans and grants was enacted in 1989 by the Seventy-first Legislature, the same legislature that enacted section 381.004.[11] As the Texas Supreme Court has said: "'It is a rule of statutory construction that every word of a statute must be presumed to have been used for a purpose. Likewise, we believe every word excluded from a statute must also be presumed to have been excluded for a purpose.'" *Laidlaw Waste Sys., Inc. v. City of Wilmer*, 904 S.W.2d 656, 659 (Tex. 1995) (citing *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981)); *see also Jones v. Houston Gen. Ins. Co.*, 736 S.W.2d 860, 863 (Tex. App.–Waco 1987, writ denied) ("The existence or non-existence of legislative intent may be inferred from the fact that a certain provision is missing from a statute."). Based on our review of these statutes, we believe that when the legislature intends to authorize a public entity to make article III, section 52-a economic development loans and grants, it provides that authority expressly. *Accord* Tex. Att'y Gen. Op. No. JM-1227 (1990) at 3 ("We think that if the legislature intended to expand the authority of cities to lend credit pursuant to article III, section 52-a, it would, at the very least, specifically mention cities' lending of credit, or section 52-a.").

### 3. Legislative History of Section 381.004

Our conclusion that the lack of express language in section 381.004 referencing article III, section 52-a or authorizing economic development loans and grants suggests that the statute is not intended to implement the constitutional provision or to authorize economic development grants is confirmed by the legislative history of section 381.004, which contains no mention of article III, section 52-a, and, moreover, indicates that the legislature did not intend section 381.004 to authorize a commissioners court to make economic development grants.

Section 381.004 was enacted as Senate Bill 24 in 1989. As first introduced, Senate Bill 24 amended former article 2351i of the Revised Civil Statutes to authorize the Harris County Commissioners Court to engage in community and economic development projects, particularly

---

[11]Section 380.001 of the Local Government Code was *enacted by* Act of May 28, 1989, 71st Leg., R.S., ch. 555, § 1, 1989 Tex. Gen. Laws 1856.

those under Title I of the Housing and Community Development Act of 1974. *See* Tex. S.B. 24, 71st Leg., R.S. (1989) (as introduced). The senate committee substitute would have achieved the same purpose by adding section 381.004 to the Local Government Code. *See* Tex. C.S.S.B. 24, 71st Leg., R.S. (1989) (Senate Committee Substitute). The analysis by the Senate Committee on Inter-governmental Relations of the committee substitute bill suggests that Harris County was particularly concerned about its legal authority "to enter into projects . . . with other local governments, political subdivisions, and other public and private entities." SENATE COMM. ON INTERGOVERNMENTAL RELATIONS, BILL ANALYSIS, Tex. C.S.S.B. 24, 71st Leg., R.S. (1989). In the bill analysis and the committee hearing on the committee substitute, no mention was made of article III, section 52-a or the authority to make economic development grants. *See id.*; *see also Hearings on Tex. C.S.S.B. 24 Before the Senate Comm. on Intergovernmental Relations*, 71st Leg., R.S. (Feb. 14, 1989) (audio tape available from Senate Staff Services Office).

A subcommittee of the House Committee for County Affairs jettisoned the version of Senate Bill 24 that pertained only to Harris County and substituted the following:

Chapter 381, Local Government Code, is amended by adding Section 381.004 to read as follows:

Section 381.004.   COMMUNITY AND ECONOMIC DEVELOPMENT PROGRAMS.

(a) The commissioners court of a county may develop and administer a program for state or local economic development to stimulate business and commercial activity in the county.

(b) A program established under this section is subject to approval of the commissioners court.

(c) The commissioners court may:

(1) contract with the federal government, the state, a political subdivision of the state, a nonprofit organization, or any other person or entity for the administration of the program; and

(2) accept contributions, gifts, or other resources to develop and administer the program.

Tex. C.S.S.B. 24, 71st Leg., R.S. (1989) (House Committee Report).

Importantly, this language incorporated portions of another bill, House Bill 203, which authorized a commissioners court "to develop and administer a program" among other things "for state or local economic development" and "to stimulate, encourage, and develop business location

and commercial activity in the county." *See* Tex. H. B. 203, 71st Leg., R.S. (1989) (as introduced). Given the close proximity between the language of House Bill 203 and the final version of Senate Bill 24, the House Committee on County Affair's hearing on House Bill 203 is significant. During that hearing, the author of House Bill 203 indicated that the primary purpose of the bill was to authorize commissioners courts to expend funds to market their counties and to cooperate with cities in these kinds of marketing efforts. *Hearings on Tex. H.B. 203 Before the House Comm. on County Affairs*, 71st Leg., R.S. (Feb. 14, 1989) (testimony of Rep. Eckels, House Sponsor) (audio tape available from House Video/Audio Services). While the author indicated that the bill would give counties broad authority, he also said the bill would "stop short" of one thing: "there was some concern that [counties would] be able to make loans, direct loans, and grants. I don't think this bill would authorize that, although we're checking into it." *Id.* He continued that under the bill counties might be able to "do small business incubation . . . but I don't think it would allow them to give money directly to private business." *Id.* The general counsel to the County Judges and Commissioners Association also stated that the bill would "not extend any authority to make loans or grants of public money." *Id.* (testimony of Jim Allison, General Counsel, County Judges & Commissioners Assoc.). The hearing includes no mention of article III, section 52-a.

During the House Committee on County Affair's hearing on the house committee substitute version of Senate Bill 24, the committee chair explained that Senate Bill 24 had been revised to incorporate House Bill 203 and described the bill in general terms but did not address whether the bill authorized a commissioners court to make economic development grants. *Hearings on Tex. C.S.S.B. 24 Before House Comm. on County Affairs*, 71st Leg., R.S. (March 21, 1989) (statement of Rep. John Willy) (audio tape available from House Video/Audio Services). Senate Bill 24 was later amended on the house floor. Those amendments are not directly relevant to the issues here.

The differences between the House and Senate versions of Senate Bill 24 were reconciled in conference committee. For our purposes, the conference committee made two important changes to the version of Senate Bill 24 reported by the house committee. First, it added the language in section 381.004(b)(3) providing that a commissioners court may adopt and administer a program "to stimulate, encourage, and develop business location and commercial activity in the county." Second, it added the language in section 381.004(c)(3) providing that a commissioners court may "use county employees or funds for the program."

Although we have been unable to locate any legislative history that would illuminate the conferees' intent in adding these provisions, we do not believe these additions may be read to authorize a commissioners court to make economic development grants. First, House Bill 203 as introduced contained identical language authorizing a commissioners court to develop and administer a program "to stimulate, encourage, and develop business location and commercial activity in the county." Tex. H.B. 203, 71st Leg., R.S. (1989) (as introduced). Again, testimony on House Bill 203 before the House Committee on County Affairs includes no mention of article III, section 52-a and indicates that that bill was not intended to authorize a commissioners court to make economic development grants or loans. Second, Senate Bill 24 as introduced would have authorized the Harris County Commissioners Court to use county "manpower" and "financial resources" in

establishing and administering projects, *see* Tex. S.B. 24, 71st Leg., R.S. (1989) (as introduced), and the senate committee substitute would have authorized the Harris County Commissioners Court "to use county employees or funds for the program." Tex. C.S.S.B. 24, 71st Leg., R.S. (1989). Again, no mention was made in the Senate Committee on Intergovernmental Relation's bill analysis or the public hearing on that bill regarding article III, section 52-a or authority to make economic development grants. *See* SENATE COMM. ON INTERGOVERNMENTAL RELATIONS, BILL ANALYSIS, Tex. C.S.S.B. 24, 71st Leg., R.S. (1989); *see also Hearings on Tex. C.S.S.B. 24 Before the Senate Comm. on Intergovernmental Relations*, 71st Leg., R.S. (Feb. 14, 1989) (audio tape available from Senate Staff Services Office).

In sum, in contrast to the article III, section 52-a enabling statutes discussed above, *see supra* pp. 8-10, neither the text nor the legislative history of section 381.004 contains any mention of article III, section 52-a. Furthermore, the legislative history confirms that section 381.004 was not enacted to implement that constitutional provision and, moreover, that the legislature did not intend section 381.004 to authorize a commissioners court to make economic development grants. Therefore, contrary to the County's assertions, *see* Supplemental Brief, at 2-3, we conclude that the term "program" in section 381.004 may not be construed to include economic development grants or to authorize a county to undertake any economic development activity contemplated by article III, section 52-a.

We note that both the request letter and the supplemental brief discuss section 381.004 in reference to the legislative history of section 380.001 and Attorney General Opinion DM-185. In that opinion, this office discussed the legislative history of section 380.001, which was also enacted in 1989, in some detail, and noted, in particular, that the author of section 380.001 testified before the House Committee on Urban Affairs that the bill was intended to "authorize a municipality to do the same thing that the legislature had just authorized counties to do, *i.e.*, to participate in economic development matters." Tex. Att'y Gen. Op. No. DM-185 (1992) at 4 n.2. Although the author may have been referring to legislation enacting section 381.004 of the Local Government Code, *see id.*, his general reference to that legislation with regard to section 380.001 does not seem relevant to the legislature's specific intent in enacting section 381.004, particularly when viewed in light of the complete absence of any reference to article III, section 52-a in the legislative history of section 381.004 and the testimony indicating that the legislature did not intend section 381.004 to authorize county economic development grants and loans. Furthermore, as noted above, *see* discussion *supra* pp. 8, 10, the Seventy-first Legislature's express language authorizing municipal "loans and grants of public money" in section 380.001 compels us to conclude that the legislature authorizes economic development grants by express provision and its omission of any mention of grants or loans in section 381.004 indicates that it did not intend section 381.004 to authorize county economic development grants.

### III. Conclusion

In conclusion, chapter 312 of the Tax Code neither precludes nor authorizes a commissioners court agreement to make payments of county funds to a private company that are the economic

equivalent of an abatement of real property taxes. We also conclude, however, that section 381.004 of the Local Government Code, which Dallas County cites as the basis for its authority to make such payments, neither expressly or impliedly authorizes a commissioners court to enter into an agreement of this kind. The legislative history indicates that the legislature did not intend section 381.004 to implement article III, section 52-a of the Texas Constitution and, moreover, confirms that the legislature did not intend section 381.004 to authorize county economic development loans and grants.

## S U M M A R Y

Chapter 312 of the Tax Code neither precludes nor authorizes a commissioners court agreement to make payments of county funds to a private company that are the economic equivalent of an abatement of real property taxes. However, section 381.004 of the Local Government Code, which Dallas County cites as the basis for its authority to make such payments, neither expressly or impliedly authorizes a commissioners court to enter into an agreement of this kind. The legislative history indicates that the legislature did not intend section 381.004 to implement article III, section 52-a of the Texas Constitution and, moreover, confirms that the legislature did not intend section 381.004 to authorize county economic development loans and grants.

Yours very truly,

JOHN CORNYN
Attorney General of Texas

ANDY TAYLOR
First Assistant Attorney General

CLARK KENT ERVIN
Deputy Attorney General - General Counsel

ELIZABETH ROBINSON
Chair, Opinion Committee

Mary R. Crouter
Assistant Attorney General - Opinion Committee